IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| J. B., a minor, by and through his mother, Stacy Brown | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CV 1:11-1182-RBP |
| SHERIFF LARRY AMERSON and DEPUTY WARD | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard on the defendants' Motion to Dismiss the plaintiff's Second Amended Complaint filed on July 27, 2011. The court heard recorded oral arguments on October 4, 2011. At the October 4th hearing the parties agreed that the following claims of the plaintiff should be dismissed without prejudice:

(1) The supervisory claims against defendant Amerson in Count IV. The only remaining claim(s) against Amerson in Count IV are claim(s) which allege participation by him.

(2) All claim(s) in Count VI.

The claims of the plaintiff which the defendants have moved to dismiss now addressed by the court are those stated in Count V which are made pursuant to 42 U.S.C. § 5633(a) (11) (12) (13) and (15) ("Act"or "JJDPA"). The plaintiff does not make said claims by virtue of the plaintiff having any direct private right of action under said Act, but bases the claims on alleged rights created under the Act for which the plaintiff claims remed(ies) under 42 U.S.C. § 1983.

The issues which are raised with regard to said claims include:

(1) Whether the Act even applies in general to the circumstances of this case. This raises *inter alia*, whether the Act only applies to juveniles who have committed a crime or offense as to which there has been some involvement in a judicial process.

(2) Whether, even if the Act is applicable, the alleged violations are proscribed in the Act.

(3) Whether any right or benefit to the plaintiff is created under the Act which might create a claim pursuant to 42 U.S.C. § 1983.

In J.B.'s complaint he cites 42 U.S.C. § 5633(a)(11), (12), (13), & (15). These provisions state:

(a) Requirements

In order to receive formula grants under this part, a State shall submit a plan for carrying out its purposes applicable to a 3-year period. Such plan shall be amended annually to include new programs, projects, and activities. The State shall submit annual performance reports to the Administrator which shall describe progress in implementing programs contained in the original plan, and shall describe the status of compliance with State plan requirements. In accordance with regulations which the Administrator shall prescribe, such plan

. . . .

(11) shall, in accordance with rules issued by the Administrator,[1] provide that–

(A) *juveniles who are charged with or who have committed an offense that would not be criminal if committed by an adult*, excluding–

(i) juveniles who are charged with or who have committed a

---

[1] Here, the term "Administrator" refers to the head of the Office of Juvenile Justice and Delinquency Prevention (OJJDP). *See* 42 U.S.C. §§ 5603(5), 5611(b). For the regulations or "rules" referenced in the text above, see OJJDP Grant Programs, 28 C.F.R. pt. 31 (2010).

>>violation of section 922(x)(2) of Title 18[2] or of a similar State law;
>>
>>(ii) *juveniles who are charged with or who have committed a violation of a valid court order*; and
>>
>>(iii) juveniles who are held in accordance with the Interstate Compact on Juveniles[3] as enacted by the State;
>
>*shall not be placed in secure detention facilities or secure correctional facilities*; and
>
>(B) juveniles–
>
>>(i) who are not charged with any offense; and
>>
>>(ii) who are–
>>
>>>(I) aliens; or
>>>
>>>(II) alleged to be dependent, neglected, or abused;
>
>*shall not be placed in secure detention facilities or secure correctional facilities*;

(12) provide that–

>(A) juveniles alleged to be or found to be delinquent or juveniles within the purview of paragraph (11) *will not be detained or confined in any institution in which they have contact with adult inmates*; and
>
>(B) there is in effect in the State a policy that requires individuals who work with both such juveniles and such adult inmates, including in collocated facilities, have been trained and certified to work with juveniles;

(13) provide that *no juvenile will be detained or confined in any jail or*

---

[2] *See* 18 U.S.C. § 922(x)(2) (2006) (making it unlawful "for any person who is a juvenile to knowingly possess – (a) a handgun; or (b) ammunition that is suitable for use only in a handgun.")

[3] *See* Ala. Code §§ 44-2-1 to -26 (1975) (providing procedures regulating the movement across state lines of juveniles under court supervision).

3

*lockup for adults*[4] except–

> (A) juveniles who are *accused of nonstatus offenses and who are detained in such jail or lockup for a period not to exceed 6 hours–*
>
>> (i) for processing or release;
>>
>> (ii) while awaiting transfer to a juvenile facility; or
>>
>> (iii) in which period such juveniles make a court appearance;
>
> and only if such juveniles do not have contact with adult inmates and only if there is in effect in the State a policy that requires individuals who work with both such juveniles and adult inmates in collocated facilities have been trained and certified to work with juveniles;
>
> (B) *juveniles who are accused of nonstatus offenses, who are awaiting an initial court appearance that will occur within 48 hours after being taken into custody* (excluding Saturdays, Sundays, and legal holidays), *and* who are detained in a jail or lockup–
>
>> (i) in which–
>>
>>> (I) such juveniles do not have contact with adult inmates; and
>>>
>>> (II) there is in effect in the State a policy that requires individuals who work with both such juveniles and adults inmates in collocated facilities have been trained and certified to work with juveniles; and
>>
>> (ii) that–

---

[4] Subsection (13)—formerly subsection (14)— was initially added as part of the Juvenile Justice Amendments of 1980, Pub. L. No. 96-509, § 11, 94 Stat. 2750 (1980). The House Report accompanying this amendment stated:

> Witnesses during the hearings pointed to potential physical and sexual abuse encountered by juveniles incarcerated in adult jails. It was pointed out that during 1978, the suicide rate for juveniles incarcerated in adult jails was approximately seven times the rate of children held in secure juvenile detention facilities. One department of justice official termed this a "national catastrophe."

H.R. Rep. No. 96-946, at 25 (1980).

> (I) is located outside a metropolitan statistical area (as defined by the Office of Management and Budget) and has no existing acceptable alternative placement available;
>
> (II) is located where conditions of distance to be traveled or the lack of highway, road, or transportation do not allow for court appearances within 48 hours (excluding Saturdays, Sundays, and legal holidays) so that a brief (not to exceed an additional 48 hours) delay is excusable; or
>
> (III) is located where conditions of safety exist (such as severe adverse, life-threatening weather conditions that do not allow for reasonably safe travel), in which case the time for an appearance may be delayed until 24 hours after the time that such conditions allow for reasonable safe travel;
>
> . . . .
>
> (15) provide *assurance that youth in the juvenile justice system are treated equitably on the basis of gender, race, family income, and disability*;

42 U.S.C. § 5633(a)(11), (12), (13), (15).[5]

The court will not repeat the factual allegations which may be related to the claims made pursuant to the JJDPA because the court has concluded that the status of the plaintiff at the time of the alleged violations was not such that he was covered under the provisions of the Act on which these statutory claims are made.

The case of *Horn v. Madison County Fiscal Court*, 22 F.3d 653 (6th Cir. 1994), the only circuit court case arguably applicable here, is distinguishable from this case. The juvenile there had been convicted of an offense and had been picked up and placed in an adult jail pursuant to a court order. *Horn* refers to juveniles who are "status offenders and juvenile delinquents." *Id.* at

---

[5] Note that these provisions state what states will include in plans. They do not refer to individual officials.

658. 28 C.F.R. § 31-304(h) defines "status offender" as "a juvenile offender who has been charged with or adjudicated for conduct which would not, under the law of the jurisdiction in which the offense was committed, be a crime if committed by an adult." This definition is substantially the same as the definition of "juvenile delinquent" in *Black's Law Dictionary, Seventh Edition*. *Black's* defines "juvenile delinquent" as, "a minor *guilty* of *criminal* behavior, which is usua. *punished* by special laws not pertaining to adults." (Emphasis added). *Black's* defines "offense" as: "a violation of the law; a crime, often a minor one."

*Horn* states, citing *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 510-12, (1990), that "the Supreme Court recognized that conditions placed upon the disbursement of federal funds to a state may confer enforceable rights upon the intended beneficiaries of the funding assistance. However, the conditions must be unambiguous, specific and mandatory." *Horn*, 22 F.3d at 657. It is certainly not unambiguous or specific that the plaintiff was a status offender or a juvenile delinquent in this case.[6]

This court generally agrees with *Horn* that if a plaintiff has a private right under the Act, § 1983 may provide a remedy. This court cannot agree, however, with plaintiff's argument that

---

[6] The North Carolina Governor's Crime Commission has issued a statement regarding the Act. See attached Exhibit A. It states: "In order for a juvenile's scared straight participation to be out of compliance with the JJDP Act, *All* of the following must be true:

The juvenile is participating in the program under public authority (e.g., the juvenile is detained or confined in the institution under some form of public order, such as a probation requirement or a court order, the juvenile is under arrest or is held securely for committing an offense), AND

The facility in which the contact with adult offenders occurs qualifies as a "secure facility" within the meaning of the JJDP Act (in addition to jails and other facilities with holding cells, the term "secure facility" includes buildings that allow for cuffing of a juvenile offender to a stationary object, as well as buildings with rooms/enclosures that can be locked to prevent exit from within), AND

The juvenile has sight-or-sound-contact with an adult offender while the juvenile is in a secure area.

the Act covers this plaintiff.[7]

28 C.F.R. § 31-304(d) defines a "juvenile who is accused of having committed an offense" as: "a juvenile with respect to whom a petition has been filed in the juvenile court or other action has occurred alleging that such juvenile is a juvenile offender, i.e., a *criminal-type* offender or a status offender, and no final adjudication has been made by the juvenile court." (Emphasis added). 28 C.F.R. § 31-304(e) states: "Juvenile who has been adjudicated as having committed an offense." "A juvenile with respect to whom the juvenile court has determined that such juvenile is a juvenile offender, i.e., *a criminal-type* offender or a status offender." (Emphasis added). 28 C.F.R. § 31-304(f) states: "Juvenile offender." "An individual subject to the exercise of juvenile court jurisdiction for purposes of adjudication and treatment based on age and offense limitations defined by State law, i.e., as a criminal-type offender or a status offender." (Emphasis added).[8]

This court has not made a full study of the legislative history pertaining to the Act. A cursory review of the history suggests that a substantial purpose of the Act is to prevent and respond to juvenile delinquency, not just to give a benefit to juveniles who may be involved in the legal system. After the Sixth Circuit decided in *Horn,* paragraphs (12), (13) and (14) were renumbered (11), (12), and (13), respectively. *See* Juvenile and Delinquency Prevention Act of 2002, Pub. L. No. 107-273, Div. C, Title II, Subtitle B. § 12209)1)(D), 116 Stat. 1874 (2002)

---

[7] There is apparently no evidence that the defendants considered the subject program to be a "scared straight" program. The defendants call the program the "Calhoun County Sheriff's Department Suspended Student Program." This court realizes that scared straight programs do not have universal admiration; they perhaps have majority condemnation. Here it makes no difference because this judge is neither a policy maker nor a legislator. This court only attempts to correctly consider and interpret the Act.

[8] See the same C.F.R. for other definitions which may be pertinent.

7

(striking paragraph (6) in § 5633(a)).

In the Second Amended Complaint the plaintiff alleges in paragraph 90 that "J.B. was charged with no crime, had committed no crime and was suspected of no crime . . . J.B. had violated a school internet policy." In paragraph 91 plaintiff alleges that "J.B. was voluntarily participating in Sheriff Amerson's 'community service' program." It is certainly questionable as to whether someone who voluntarily participates in a program is in "detention" or is being "detained."

In his response filed on August 22, 2011, the plaintiff makes the following interesting statements:

> Congress enacted the Juvenile Justice Act, 42 U.S.C. § 5601, *et seq.*, to improve state programs which address the problems of juvenile delinquency. The stated purposes of the Act are to prevent delinquency, to divert juveniles from the traditional justice system and to provide alternatives to institutionalization, to improve juvenile justice and to increase the capacity for juvenile delinquency prevention and rehabilitation programs. 42 U.S.C. § 5602(b).
>
> . . . .
>
> As Defendants recognized and so eloquently expounded within their motion, the statute is clear that the states must either meet these statutory requirements or lose their eligibility for funding. See 42 U.S.C. § 5633(a). In addition, the Act expressly requires that failure to achieve compliance within a certain period of time shall terminate the state's eligibility for funding. *Id.* Based thereon, the Juvenile Justice Act has expressly conditioned the funding and reserved the power to withhold funding and, as such, created enforceable rights for juveniles under and through the Act. A cursory reading of the Juvenile Justice Act reveals that it contains no private judicial remedies for private parties and, in addition, to administrative procedures for redressing violations of the statute. The only available remedies for redress for violations of the Act are contained in sections 5633(a) and (c), i.e. cutting off funds or blocking states' eligibility for funding.

. . . .

Plaintiff has belatedly attempted to argue allegations not made in the Second Amended Complaint. These allegations are with reference to an unrelated disorderly conduct charge in 2010, contrary to the allegations in the paragraphs 90 and 91 of the Second Amended Complaint.

While there have been no U. S. Supreme Court or Eleventh Circuit cases which have directly discussed enforceability of purported statutory rights in the context of the JJDPA,[9] there have been cases which have discussed whether enforceable private rights exist under other statutes.

The Eleventh Circuit has stated:

In *Blessing v. Freestone*, 520 U.S. 329, 340 (1997), the Supreme Court developed a three-part test to determine "whether a particular statutory provision gives to a federal right" redressable via § 1983. The three prerequisites *Blessing* sets forth to establish that a federal statute confers individual rights enforceable under § 1983 are:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006) (quoting *Blessing*, 520 U.S. at 340-41). Such an inquiry is not for the faint of heart though because to determine whether a federal statute confers individual rights, courts must engage in "methodical inquir[ies]" in which the rights claimed are "identif[ied] with particularity." *Blessing*, 520 U.S. at 342-43.

The Eleventh Circuit has further observed:

"Specifically, [in *Gonzaga*] the Supreme Court asserted if a federal statute's text and

---

[9] There is a slight reference to the Act in dicta in a dissenting opinion in *Maine v. Thiboutot*, 448 U.S. 1, 37 (1980).

structure "provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.' Ambiguity precludes enforceable rights." *31 Foster Children v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003) (citing *Gonzaga*, 536 U.S. at 280, 122 S. Ct. at 2273). To determine whether Congress intended the provisions in question to benefit the plaintiff, a court must weigh three factors: "whether the statute (1) contains 'rights-creating' language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review." *Id.*

*Arrington v. Helms*, 438 F.3d 1336, 1343-44 (11th Cir. 2006).

The Eleventh Circuit described *Gonzaga's* effect on *Blessing* in the following manner:

In summary, when a plaintiff claims a statutory provision creates individual rights enforceable under § 1983, she must establish all three requirements set forth in *Blessing*. The first *Blessing* requirement instructs us to determine whether Congress intended that the provision in question benefit the plaintiff. To decide whether the provision satisfies this first *Blessing* requirement, we must weigh the three factors set forth in *Gonzaga*. Specifically, we must consider whether the provision (1) contains individually focused, rights-creating language; (2) has an individual, rather than systemwide or aggregate, focus; and (3) lacks an enforcement mechanism for aggrieved individuals. If we determine these three *Gonzaga* factors weigh against a finding that Congress intended the provision to benefit the plaintiff, then the provision does not satisfy the first *Blessing* requirement and the plaintiff's claim must fail.[10]

*Id.* at 1345.

This court concludes that it is not clearly established by the Act nor case law that the plaintiff has any privately enforceable right under the Act. Not only is the plaintiff not covered by the Act, it is highly questionable that the defendants are. The Act requires the state to adopt a

---

[10] § 5633's language, like the language of the statute at issue in *Gonzaga*, "speaks only to the states, . . . it does not speak directly to individual [juvenile offenders]." *Arrington*, 438 F.3d at 1436. As such, the language in § 5633 "is at least one step removed from speaking of individually enforceable private rights, and does not evince Titles VI and IX's '"unmistakable focus on the benefitted class."'" Id. (quoting *Gonzaga*, 536 U.S. at 284). And this conclusion comports with both *31 Foster Children* and *Arrington*. In particular, the phrase "such plan shall" prefaces each individual paragraph in § 5633(a), which is akin to the phrase "the State shall"that the Eleventh Circuit found determinative in both *31 Foster Children* and *Arrington*. See *Arrington*, 438 F.3d at 1346. *See also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989) and *Suter v. Artists*, 503 U.S. 347 (1992).

plan in order to receive funds. No obligation is imposed on individual law enforcement officers. The stated result of violation(s) is the loss of funds. The individual defendants are, of course, subject to rights of citizens created by the United States Constitution. Section 1983, however, does not create substantive rights. It is certainly not clearly established that the Act imposes any obligations on sheriffs and deputies, nor that it subjects them to penalties for violations. At best, the Act is ambiguous and Eleventh Circuit law suggests that it would not conclude that there are such privately enforceable rights under the Act. This court does *not* conclude that § 1983 would not provide a remedy if there were such private rights and obligations under the Act.

This the 7th day of December, 2011.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**